IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN  DIVISION

CASANDRA MULLIN,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )     Case No.
                                    )     14-3217-CV-S-REL-SSA
CAROLYN W. COLVIN, Acting           )
Commissioner of Social Security,    )
                                    )
            Defendant.              )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Casandra Mullin seeks review of the final decision of the Commissioner

of Social Security denying plaintiff's application for disability benefits under Titles II and

XVI of the Social Security Act ("the Act").  Plaintiff argues that (1) because the medical

expert testified that plaintiff had not received any unnecessary medical treatment, and

the record reflects that plaintiff saw a doctor 10 to 14 times per year, she would have

missed too much work to be employed; (2)  the hypothetical posed to the vocational

expert did not include the condition that plaintiff miss 10 to 14 days of work per year for

medical treatment; (3) the ALJ accepted the medical opinion of Dr. Bentlif but did not

accept his "opinion" regarding plaintiff's absences from work due to medical

appointments and did not explain why the "full opinion" of Dr. Bentlif was not given

controlling weight; (4) the ALJ's opinion is factually deficient in that it does not address

the fact that a nurse prescribed a walker, the ALJ stated that plaintiff had not tried to

quit smoking when the record reflects that she tried Chantix and nicotine patches

without success, the ALJ inaccurately stated that plaintiff had not complained of

significant leg symptoms between January 2008 and October 2010, and the ALJ noted

that plaintiff had not followed up with a nephrologist when the record shows that she did; and (5) the ALJ erred in finding plaintiff's subjective complaints not credible because he failed to consider the side effects of plaintiff's medications and he failed to consider plaintiff's explanations for lack of treatment and her efforts to obtain pain relief. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On August 1, 2007, plaintiff applied for disability benefits alleging that she had been disabled since July 1, 2007. Plaintiff's application was denied initially. She retained an attorney on June 10, 2008, but that lawyer withdrew in April 2009. A new attorney was retained in August 2009. On September 8, 2009, a hearing was held before Administrative Law Judge James Seiler. On December 19, 2009, ALJ Seiler found that plaintiff was not under a "disability" as defined in the Act. Plaintiff appealed that decision to the Appeals Council and also filed a subsequent application for disability benefits on June 30, 2010. On July 21, 2011, the Appeals Council remanded the case to the Commissioner, consolidating the original and subsequent applications into one case. Administrative hearings were held on February 8, 2012, and August 30, 2012, before Administrative Law Judge Kenton Fulton who issued an unfavorable decision on November 16, 2012. On March 14, 2014, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because

3

substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.   BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

4

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>    No = not disabled.
>    Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

>    Yes = disabled.
>    No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

>    No = not disabled.
>    Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

>    Yes = disabled.
>    No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff, medical expert Philip Sidney Bentlif, M.D., and vocational expert Terri Crawford, in addition to documentary evidence admitted at the hearing.

### A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1992 through 2011:

|  |  |
| --- | --- |
| 1992 Total Earnings | $ 523.81 |
| 1993 Total Earnings | 1,047.85 |

5

| | |
|---|---|
| B&B Cash Grocery Stores, Inc. | 1,731.01 |
| Winn Dixie Stores, Inc. | 416.93 |
| United Fuels Corporation | 4,354.05 |
| Burger King | 12.75 |
| Florida's Finest Chicken | 203.53 |
| **1994 Total Earnings** | **6,718.27** |
| | |
| Suwannee Swifty Stores, Inc. | 941.37 |
| Waffle House | 47.86 |
| United Fuels Corporation | 954.33 |
| Pic N Save Drug | 397.82 |
| Pipeline Foods | 126.00 |
| MMI Hotel Group | 596.92 |
| Albertsons | 1,940.75 |
| **1995 Total Earnings** | **5,005.05** |
| | |
| Junior Food Stores | 1,361.24 |
| Lil Champ Food Stores | 5,450.16 |
| United Fuels Corporation | 3,964.49 |
| **1996 Total Earnings** | **10,775.89** |
| | |
| Quick Way Stores | 937.49 |
| Alvin's Stores | 1,089.38 |
| Sangaree Oil Company | 793.60 |
| Subway Sandwich Shop | 204.58 |
| Merchants Promotions | 21.25 |
| Waffle Shack Beach Bakery | 228.16 |
| **1997 Total Earnings** | **3,274.46** |
| | |
| B&B Cash Grocery Stores | 1,007.64 |
| Handy Food Stores | 2,232.45 |
| **1998 Total Earnings** | **3,240.09** |

Case 6:14-cv-03217-REL   Document 17   Filed 08/27/15   Page 6 of 50

| | |
|---|---:|
| Illico, Inc. | 147.00 |
| Docs Drugs | 1,844.20 |
| Niemann Foods | 988.56 |
| Manpower of Indiana | 411.13 |
| Winn Dixie Stores | 1,363.32 |
| Adecco Employment Services | 1,678.05 |
| **1999 Total Earnings** | **6,432.26** |
| Docs Drugs | 4,055.03 |
| Clark Retail Enterprises | 2,122.92 |
| B&B Cash Grocery Stores | 1,043.38 |
| Dollar General | 136.43 |
| **2000 Total Earnings** | **7,357.76** |
| Eckerd Corporation | 484.80 |
| **2001 Total Earnings** | **484.80** |
| Junior Food Stores of West Florida | 2,417.03 |
| Braids and Britches | 1,893.45 |
| Self Employment | 650.00 |
| **2002 Total Earnings** | **4,960.48** |
| Junior Food Stores of West Florida | 918.44 |
| Braids and Britches | 899.40 |
| **2003 Total Earnings** | **1,817.84** |
| Wal-Mart | 8,079.13 |
| **2004 Total Earnings** | **8,079.13** |
| Prolease Southeast Corp. | 1,300.82 |
| Junior Food Stores of West Florida | 3,535.05 |
| Bennett Eubanks Oil Company | 3,082.76 |
| Galo Enterprises | 218.39 |
| Wal-Mart | 1,176.67 |
| **2005 Total Earnings** | **9,313.69** |

| | |
|---|---|
| Bennett Eubanks Oil Company | 2,247.23 |
| Goldco, Inc. | 3,222.79 |
| Modern Business Associates | 3,607.64 |
| **2006 Total Earnings** | **9,077.66** |
| Modern Business Associates | 6,009.16 |
| **2007 Total Earnings** | **6,009.16** |
| **2008 Total Earnings** | **0.00** |
| **2009 Total Earnings** | **0.00** |
| **2010 Total Earnings** | **0.00** |
| **2011 Total Earnings** | **0.00** |

(Tr. at 273, 278-286, 297-305).

**Function Report - Adult**

In a Function Report dated October 16, 2007, plaintiff reported that she tries to clean (on good days), she helps her children with their homework, she needs no special reminders to take care of personal needs and grooming, she can do laundry and dishes on good days, she can go out alone if she has not taken her medication, she shops for groceries in stores and through Swans Food Service, her hobbies include reading ("I like to read so I [do] it often as I can") (Tr. at 319-326). She has no problems getting along with family, friends, neighbors or others. Her impairments do not affect her ability to squat, bend, reach, remember, understand, follow instructions, use her hands or get along with others. Her impairments do affect her ability to lift, stand, walk, sit, kneel, talk, climb stairs, complete tasks and concentrate. She is able to follow written and

spoken instructions.  She gets along with authority figures "fine."  She has never been

fired for a job because of problems getting along with other people.

**Function Report - Adult**

In another Function Report, this one dated March 21, 2008, plaintiff reported that

her doctor has her on bed rest (Tr. at 344-351).  Plaintiff can sometimes do dishes and

do laundry.  Plaintiff likes to read and since she cannot walk much, she has been

reading "a lot more."  She talks on the phone every day, she goes to church and school

activities if she feels good, and sometimes she does these things by herself.  Plaintiff's

impairments do not affect her ability to remember, concentrate, understand, follow

instructions or use her hands.  Her pills put her in a "real bad mood" and sometimes

affect her ability to pay attention.  She has never been fired from a job because of

problems getting along with others.  Plaintiff uses a cane to help her walk, but the cane

was not prescribed by a doctor.

**Disability Report Appeal**

In a Disability Report dated April 23, 2008, plaintiff stated that she is still on bed

rest for about 8 months (Tr. at 356-363).

**Function Report**

In a Function Report dated July 24, 2010, plaintiff reported that on good days

she makes dinner, does laundry, or does dishes; but on bad days she does nothing (Tr.

at 400-407).  She takes care of her children.  Plaintiff goes out about twice a week --

the heat is what keeps her from going out more.  She cannot go out alone because of

falling.  She shops in stores twice a month for 30 minutes to an hour each time.  Her

hobbies and interests consist of her kids. She has problems getting along with family, friends, neighbors or others because of her short temper. She does not like people and she does not talk to people. Her impairments affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, remember, complete tasks, concentrate, understand, follow directions, use her hands, and get along with others -- everything except her ability to see. She can walk about 20 feet before needing to rest for 10 minutes. In this Function Report, she stated that she had been fired in the past because of problems getting along with other people. She said she does not like people.

Plaintiff reported that her impairments affect every factor listed in this report except seeing: her impairments affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, use her hands and get along with others. She can walk about 20 feet before needing to rest for 10 minutes.

**Missouri Supplemental Questionnaire**

In an undated Missouri Supplemental Questionnaire, plaintiff reported that she is covered by Medicaid; that she plays video games, puzzles or uses a computer for 10 to 15 minutes at a time; that she has a valid driver's license and can drive but chooses not to because she has "bad road rage" (Tr. at 408-410).

**B.      SUMMARY OF TESTIMONY**

During the September 8, 2009, hearing, plaintiff testified as follows:

Plaintiff is unable to work because she does not get enough oxygen in her body, she has anxiety attacks, she has schizophrenia and she has bipolar disorder (Tr. at 103). Plaintiff has a blood clot in her left leg and her toe is rotting off (Tr. at 104). Plaintiff has degenerative disc syndrome on her back (Tr. at 104).

Plaintiff lives in a one-story one-bedroom house with her husband and two children, ages 11 and 5 (Tr. at 104). Plaintiff cannot do dishes or mopping (Tr. at 105, 120). She does not sweep or vacuum (Tr. at 120). She does not cook unless it is a cool day (Tr. at 120). She tries to do some cleaning by picking up here and there and she tries to clean the bathroom (Tr. at 120). Her daughter helps her clean the bathroom because plaintiff cannot clean the tub and she cannot tolerate the chemicals (Tr. at 105). Plaintiff does not do laundry (Tr. at 120). Plaintiff tries to walk, and she reads to her kids during the day (Tr. at 105). She tries to do the grocery shopping but she does not lift any of the groceries (Tr. at 120).

Plaintiff uses a nebulizer in the morning, at noon, and right before bedtime (Tr. at 105). She uses two inhalers three to four times a day each (Tr. at 105). She uses an inhaler pack at bedtime, and she uses albuterol whenever she needs it (Tr. at 106). Using the nebulizer takes 10 to 15 minutes each time (Tr. at 106).

Plaintiff moved from Florida to Missouri in March 2009 because her asthma specialist said that there was too much pollen in Florida and it would be better for plaintiff to live where the seasons change (Tr. at 106). She also has two sisters in

11

Missouri who help her with her kids (Tr. at 106). Plaintiff's daughter is in band, soccer, computer club, and Girl Scouts (Tr. at 106). Plaintiff's sisters or her husband take her daughter where she needs to go (Tr. at 106-107).

Plaintiff continued to smoke but was smoking less than a pack a day (Tr. at 107). Plaintiff tried Chantix and using patches,[1] but she was not successful in quitting (Tr. at 108). Plaintiff used to smoke a pack and a half a day (Tr. at 108). She was able to cut down when she and her husband decided to start going outside to smoke (Tr. at 108).

Plaintiff has pain in her lower back, her legs and her left foot (Tr. at 108). Plaintiff tries to walk around the house most days; she does not go outside to walk because she cannot walk on the hills (Tr. at 108). Her legs start throbbing and she runs out of oxygen (Tr. at 108). Plaintiff rated her average pain a 6 or 7 out of 10 (Tr. at 109-110). At night when she tries to lie down, her pain is greater than a 10 out of 10 (Tr. at 109). She was taking no pain medication (Tr. at 109). Plaintiff would take 8 to 10 Tylenol PMs per night to try to get relaxed and stop the pain (Tr. at 109). During the day she took regular over-the-counter Tylenol (Tr. at 109). Before she moved plaintiff was taking Lortab (narcotic) three to four times a day (Tr. at 109). If she had to take one during the day, she would wind up going to sleep for about 45 minutes (Tr. at 109). That is why her husband made her forfeit her driver's license (Tr. at 109).

Plaintiff used to see a psychiatrist (Tr. at 110). The psychiatrist told plaintiff that as she does her journaling, more and more of her childhood would come out and the

---

[1]There is no mention of patches as an aid to smoking cessation anywhere in the medical records.

pain would get worse (Tr. at 110). Plaintiff continued to journal and the pain was getting worse (Tr. at 110). When she was seeing a psychiatrist once a month and two counselors every other week, that was helping (Tr. at 110). At the time of the hearing, plaintiff had been on no medication for any mental symptoms for the past 5 months (Tr. at 111). When she was taking psychiatric medication, it was helping her, but she could not remember what she had been taking (Tr. at 111). Plaintiff was able to do more then, but her psychiatrist did not want her to have any contact with her mother or brother (Tr. at 111).

Plaintiff does her grocery shopping in Wal-Mart (Tr. at 111). Her husband goes with her because she cannot walk through the store or drive (Tr. at 111). Plaintiff does not like crowds (Tr. at 111). When she is in a group of a lot of people, she snaps at every little thing (Tr. at 112). For example, she does her Christmas shopping early so she does not have to deal with the crowds (Tr. at 112). When asked how she takes direction from supervisors, plaintiff said, "I would want an explanation in full detail of what I'm doing wrong and if I don't feel I did that wrong, I would argue my point." (Tr. at 112).

In 1994 plaintiff worked as a cashier and in the deli (Tr. at 113). Plaintiff worked at gas stations and at grocery stores as a cashier during the years when she worked (Tr. at 114). Plaintiff worked at a one-hour photo business developing photographs, and she worked at a day care taking care of children (Tr. at 114-115). Plaintiff worked at Wal-Mart in the shoe department and then as a cashier (Tr. at 115-116). She worked at Burger King and Hardee's restaurants (Tr. at 116). Plaintiff was fired from

Hardee's because she had too many sick days and she had a confrontation with another employee (Tr. at 119-120). Plaintiff cannot do any of those jobs anymore in part because she has become too confrontational and her psychiatrist thinks it is because she still has a major gap in her life that has not been unblocked yet (Tr. at 117).

Plaintiff cannot perform a sit-down job because of her back -- her discs are dissolving in her back and she cannot sit for very long (Tr. at 118). She cannot sit for more than 5 minutes at a time (Tr. at 118). If she gets overheated, she has coughing attacks until she either throws up or urinates on herself (Tr. at 119).

Plaintiff's husband is on disability (Tr. at 119). He got hurt at Wal-Mart where he worked: "He has a hole in his spinal cord going through -- due to the fluids that did not dissolve correctly." (Tr. at 119).

During a typical day, plaintiff will get up and help her husband get their kids off to school (Tr. at 120-121). She tries to walk through the house, she takes her medication, she uses her breathing machines, she lies down, she helps her kids with homework, she gets them ready for baths, and she reads to them (Tr. at 121). Plaintiff's doctor (Dr. Bruner) wants her to do as much walking as possible (Tr. at 122). Dr. Ward has recommended that she diet (Tr. at 122). She has tried but without success (Tr. at 122).

During the February 8, 2012, hearing, plaintiff testified; and Michael Lala, a vocational expert, testified at the request of the administrative law judge.

**Plaintiff's testimony.**

At the time of this hearing, plaintiff was 35 years of age (Tr. at 50). She is 5'7" tall and weighs 180 pounds (Tr. at 50). She completed 10th grade and can read and write, but she is unable to read the big words in a newspaper (Tr. at 51). She is "not good at all" when it comes to adding, subtracting, and keeping a checkbook (Tr. at 51).

Plaintiff had training in cosmetology and she had a daycare license (Tr. at 51).

When plaintiff was asked why she believes she became disabled on July 1, 2007, she testified, "I have very bad anger issues and at that time my asthma was increasing. I was staying sick and missing work consistently to where -- well, that was part of the reason I lost my job." (Tr. at 53-54). Since July 2007 plaintiff's lungs have gotten worse and her legs are deteriorating to where her doctors have told her that eventually "they will be taking my legs" (Tr. at 54, 56). Sandy Natwick in Crawford's office in De Soto told plaintiff this (Tr. at 56). Her feet feel cold and they hurt, and they turn black "especially where one toe is starting to die off, it's super black." (Tr. at 66). Sandra Natwick ran multiple tests and found a disease in plaintiff's leg and put her on a walker (Tr. at 66). Plaintiff was having problems with her toes as far back as 2007 (Tr. at 68). On July 31, 2007, plaintiff's toe suddenly turned blue, and it had never done that before (Tr. at 69).

Plaintiff cannot walk more than 50 feet (Tr. at 54). She tries to walk, but it takes her about 45 minutes to walk the length of four houses because she has to stop and rest (Tr. at 54). She can only stand for 10 minutes at a time (Tr. at 54). Because of her lungs, she does not even attempt to lift anything (Tr. at 54-55). She can only sit for 5 to

15

10 minutes before she has to "stretch out" (Tr. at 55). It hurts to bend forward at the waist (Tr. at 55). Plaintiff cannot squat at all (Tr. at 55).

Plaintiff has pain in her legs and lower back every day (Tr. at 55-56). If she does too much or goes shopping, the next day she is "completely down" (Tr. at 56). She goes out about two days per month (Tr. at 56). Plaintiff tries not to go out when it is cold because she is very prone to catching colds (Tr. at 56). She has chest pains that come and go because she catches pneumonia very easily (Tr. at 67). When plaintiff goes out of her home, it is to go grocery shopping or her husband drives and she rides around with him to go pay bills (Tr. at 56).

Plaintiff uses an oxygen machine at night and a nebulizer twice during the day, and she uses two or three inhalers during the day, all because of her breathing problems (Tr. at 67). Plaintiff's kidneys are 80% blocked which causes her to need the bathroom frequently (Tr. at 67-68).

Plaintiff gets panicky and freaks out when she is around crowds (Tr. at 57-58). She cannot go grocery shopping at Wal-Mart -- she gets too frustrated (Tr. at 58). When asked to provide an example of how crowds bother her, plaintiff described a time when she took her daughter to Wal-Mart to buy school clothes, found that the item on the hanger was a different size than the hanger indicated, and threw the item at a worker telling her to do her job right (Tr. at 58).

Plaintiff has problems with her memory (Tr. at 56). For example, she will schedule two doctor appointments at the same time because she will forget she already had one scheduled (Tr. at 56-57). She forgets to pay bills (Tr. at 57). She does not

16

finish what she starts -- she gets frustrated and irritated and just walks away (Tr. at 57). Plaintiff keeps the television on for the noise, but she does not really watch it (Tr. at 57). She has problems following stories on TV programs or movies (Tr. at 57). Plaintiff does not read for pleasure (Tr. at 57). She uses a computer to get on Facebook (Tr. at 61).

Plaintiff was asked to describe what she does during a typical day from the time she gets up in the morning until the time she goes to bed at night (Tr. at 62).

> A typical day I ignore my daughter in the morning, if I talk to her we have to fight. I fall back to sleep with my medication. I get up around 8:00, 9:30, and see what's going on. My husband's normally doing stuff. My stepson is still asleep so I just stretch out and relax. I really don't do much. I help my son with his homework but I'm on the couch and he sits next to me. And with some of his stuff I have trouble doing because he's getting older and in some math and stuff. And I can't do it. I had a conference with the teacher about that and he's got a sponsor to where he gets special help with his -- I can't do it.

(Tr. at 62).

Plaintiff spends most of her day stretched out on the couch because her legs cannot handle her sitting up straight (Tr. at 63). They start to cramp and hurt, but when she is lying down her legs "throw themselves around" (Tr. at 63). She lies down because she is in so much pain (Tr. at 63).

Plaintiff's pain medications worked really well at first, but now that her body has gotten used to the medicine, it does not work very well anymore (Tr. at 65). Plaintiff's medications make her hands shake so that she cannot use a keyboard "or anything" (Tr. at 55). Her medications also make her very sleepy (Tr. at 53). In the morning after she takes her medication she falls asleep (Tr. at 53). She takes more medication at lunch time and falls asleep again until her kids come home (Tr. at 53). When she takes

17

her medication at bedtime, she falls asleep but she still gets up two or three times a night because she needs to move (Tr. at 53). Later in the hearing, plaintiff testified that she gets a total of 5 hours of sleep and gets up 4 or 5 times a night (Tr. at 60).

Plaintiff forfeited her driver's license due to the medication she is taking (Tr. at 50). Her husband drives her where she needs to go (Tr. at 50-51). She has no income other than her husband's (Tr. at 52). Plaintiff lives in a house with her husband, her two children and her stepson (their ages are 7, 13, and 26) (Tr. at 60). Plaintiff's husband cooks and her kids do the dishes (Tr. at 60). She tries to cook occasionally, but she gets frustrated if the kitchen is not clean (Tr. at 60). Plaintiff's husband will not let her sweep (Tr. at 60). She tries to do laundry but she cannot bend to get the clothes out of the dryer so her 7-year-old helps her (Tr. at 61). Plaintiff does not take care of the yard or take out trash (Tr. at 61). Plaintiff does the grocery shopping at a "low end store" where there are not many people (Tr. at 61). She goes there with her husband (Tr. at 61).

When plaintiff receives counseling and takes her psychiatric medications, she is "calmed down" (Tr. at 59-60). Despite that, she continues to get "worked up" when it comes to her kids and needing her house to be clean (Tr. at 60). She has been diagnosed with bipolar disorder and schizophrenia (Tr. at 60). Plaintiff was hospitalized in August 2010 for suicidal thoughts (Tr. at 63). The second time she was hospitalized, she had gotten into an argument with her husband and daughter (Tr. at 63-64). She picked up her walker because she was "blacking out, losing it. And from what I am told, I picked up my walker and tried using it on her." (Tr. at 64). The police came and told

18

plaintiff she either had to go voluntarily to the hospital or she would be forced to go (Tr. at 64). She spent 7 days in the hospital and then could not go directly home because the Department of Children and Families Services was involved (Tr. at 64).

When plaintiff was still in Florida she was seeing a psychiatrist, Dr. Chason, who stopped prescribing medication because plaintiff had a positive drug test (Tr. at 64). Plaintiff testified that she does not know how that happened (Tr. at 64). After that, plaintiff moved from Florida to the St. Louis, Missouri, area (Tr. at 65). She does not have many medical records in 2009 because she had to fight to get Medicaid (Tr. at 65). Plaintiff went to COMTREA after she got out of the hospital, but she stopped going there because she moved to Forsyth (Tr. at 65).

During the August 30, 2012, hearing, plaintiff testified; and medical expert Philip Sidney Bentlif, M.D., and vocational expert Terri Crawford testified at the request of the ALJ.

**Plaintiff's testimony.**

Plaintiff continued to have no source of income other than from her husband (Tr. at 82). Plaintiff's husband was not working, he was receiving disability income (Tr. at 82).

Plaintiff had a stent procedure the past March, but that did not fix her leg (Tr. at 83). They only did the upper part and still have to do the lower part (Tr. at 83). She was expecting the second part of the procedure to be done the following month (Tr. at 83). From the knees down, she was in a lot of pain (Tr. at 83).

**Medical expert testimony.**

Medical expert Philip Sidney Bentlif, M.D., testified at the request of the Administrative Law Judge. Dr. Bentlif is a specialist in internal medicine with a sub-specialty in gastroenterology (Tr. at 84). He is board certified in both (Tr. at 84).

Plaintiff has several independent conditions (Tr. at 85). She has asthma associated with chronic obstructive pulmonary disease (Tr. at 85). She has been a very heavy smoker since age 8 and has been labeled as having Buerger's disease[2] (Tr. at 85). Plaintiff's oxygen concentration in the blood has gone down to 80% at night and she is being treated with a CPAP (Tr. at 85). Plaintiff has peripheral vascular disease[3] with symptoms of bilateral claudication[4] and abnormal ankle brachial index[5] and has

---

[2]"Buerger's disease (thromboangiitis obliterans) is a rare disease of the arteries and veins in the arms and legs. In Buerger's disease, your blood vessels become inflamed, swell and can become blocked with blood clots (thrombi). This eventually damages or destroys skin tissues and may lead to infection and gangrene. Buerger's disease usually first shows in the hands and feet and may eventually affect larger areas of your arms and legs. . . . Virtually everyone diagnosed with Buerger's disease smokes cigarettes or uses other forms of tobacco, such as chewing tobacco. Quitting all forms of tobacco is the only way to stop Buerger's disease. For those who don't quit, amputation of all or part of a limb may be necessary." http://www.mayoclinic.org/diseases-conditions/buergers-disease/basics/definition/con-20029501

[3]Peripheral vascular disease refers to any disease or disorder of the circulatory system outside of the brain and heart.

[4]Pain caused by too little blood flow.

[5]ABI, or ankle-brachial index, is a "quick, noninvasive way to check your risk of peripheral artery disease (PAD). Peripheral artery disease is a condition in which the arteries in your legs or arms are narrowed or blocked. People with peripheral artery disease are at an increased risk of heart attack, stroke, poor circulation and leg pain. The ankle-brachial index test compares your blood pressure measured at your ankle with your blood pressure measured at your arm. A low ankle-brachial index number

been treated with placement of a stent (Tr. at 85-86). This condition is permanent even though it has been partly corrected by placement of the stent (Tr. at 87). She has involvement of the minor, small arteries in the toes and this will be progressive in spite of the fact that the main arteries to the legs have been opened up by the stent (Tr. at 87). Her left fourth toe is cyanotic through a lack of circulation (Tr. at 86). Plaintiff has a bulging disc at L2-L3 with minimal stenosis (narrowing), and she has a disc protrusion on the right side at L4-L5 with the disc impinging on the thecal sac associated with mild central canal stenosis (Tr. at 86). Plaintiff had diminished sensation to pin prick and vibration in her lower legs, but that is peripheral neuropathy related to excessive nicotine consumption (Tr. at 86).

Dr. Bentlif provided his opinion on how plaintiff's physical condition is limited due to her impairments (Tr. at 87-88). She should be restricted to sedentary activities with the ability to lift 15 pounds occasionally and 10 pounds frequently; she can sit for 6 hours per day; she can stand and walk for a total of 4 hours per day; she cannot climb ropes, ladders or scaffolding; she can climb one ramp or one flight of stairs at a time; she can occasionally stoop, kneel, crouch or crawl (Tr. at 88). She has no restrictions with her upper extremities (Tr. at 88). She should not be exposed to excessive heat, excessive cold, even minimal amounts of fumes, dusts or irritants (Tr. at 88). Dr. Bentlif stated, "There's a very strong psychiatric aspect to this case which is not in my realm of

---

can indicate narrowing or blockage of the arteries in your legs, increasing your risk of circulatory problems, and possibly causing heart disease or stroke."
http://www.mayoclinic.org/tests-procedures/ankle-brachial-index/basics/definition/prc-20014625

competence to comment on." (Tr. at 88). "Again as I said I have not commented because I'm not competent to on the significant psychiatric aspects of this case." (Tr. at 91).

Plaintiff should be able to work an 8-hour day (Tr. at 89). The main problem she has with her strength is her chronic bronchitis, asthmatic bronchitis, nicotine bronchitis and chronic obstructive pulmonary disease (Tr. at 89). With regard to the medical records that deal with Dr. Bentlif's areas of expertise, plaintiff has not received unnecessary medical treatment (Tr. at 90).

**Vocational expert testimony.**

Vocational expert Terri Crawford testified at the request of the Administrative Law Judge. The first hypothetical involved a person who can lift 10 pounds frequently and 15 pounds occasionally; sit 6 hours per day; walk or stand for a total of 4 hours per day; and can do no climbing of ropes, ladders or scaffolds but can climb one flight of stairs at a time (Tr. at 93). The person can occasionally stoop, kneel, crouch or crawl (Tr. at 93). The person would need to avoid exposure to temperature extremes, fumes, dust, odors and pulmonary irritants (Tr. at 93-94). The person would be limited to only simple tasks and instructions (Tr. at 94).

Such a person could not perform any of plaintiff's past relevant work (Tr. at 94). The person could, however, perform sedentary unskilled work such as charge account clerk, DOT 205.367-014, SVP of 2, with 38,000 jobs in the country and 700 in Missouri, or food and beverage order clerk, DOT 209.567-014, SVP of 2, with 17,000 in the country and 400 in Missouri (Tr. at 94).

The second hypothetical was the same as the first except the person would lack the ability on a sustained basis to maintain persistence and pace on assigned work tasks (Tr. at 95). Such a person could not work other than in a sheltered-workshop type environment (Tr. at 95).

The third hypothetical was the same as the first except the person would miss 2 or more days of work per month (Tr. at 96). Anyone who misses more than 1 day of work per month would be unemployable, and some unskilled jobs will not tolerate even 1 day per month (Tr. at 96).

Both of the jobs available to the person in the first hypothetical involve dealing with the general public (Tr. at 96).

## V.   FINDINGS OF THE ALJ

Administrative Law Judge Kenton Fulton entered his opinion on November 16, 2012 (Tr. at 8-24). Plaintiff's last insured date was June 30, 2012 (Tr. at 13).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 13).

Step two. Plaintiff has the following severe impairments:  obesity; respiratory disorders described as asthma and chronic obstructive pulmonary disease; cardiac disorders described as peripheral vascular disease, coronary artery disease, and Buerger's disease; degenerative disc disease of the lumbar spine; mental disorders described as major depressive disorder, post-traumatic stress disorder, bipolar disorder, schizoaffective disorder, anxiety disorder not otherwise specified, borderline personality disorder, and personality disorder not otherwise specified (Tr. at 13).

23

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 13-15).

Step four.  Plaintiff retains the residual functional capacity to perform sedentary work except that she can lift 15 pounds occasionally and 10 pounds frequently; she can sit for 6 hours per day; she can stand and/or walk for 4 hours per day; she cannot climb ropes, ladders or scaffolds; she can climb up to 1 flight of stairs; she can occasionally stoop, kneel, crouch and crawl; she should avoid exposure to temperature extremes; she must avoid any exposure to fumes, dusts, odors and pulmonary irritants; and she is limited to simple tasks and instructions (Tr. at 15-16).  With this residual functional capacity plaintiff is unable to return to her past relevant work (Tr. at 22-23).

Step five.  Plaintiff was 30 years of age on her alleged onset date, which is a younger individual according to the Social Security Act (Tr. at 23).  She has a limited education and is able to communicate in English (Tr. at 23).  Plaintiff is capable of performing other jobs such as charge account clerk and food and beverage order clerk, both available in significant numbers (Tr. at 23).  Therefore plaintiff is not disabled (Tr. at 24).

## VI.    PLAINTIFF'S WORK ABSENCES

Three of plaintiff's arguments rely on the premise that plaintiff is disabled because of her numerous doctor appointments.  Plaintiff argues that (1) because Dr. Bentlif, the medical expert, testified that plaintiff had not received any unnecessary medical treatment, and the record reflects that plaintiff saw a doctor 10 to 14 times per year, she would have missed too much work to be employed; (2) the hypothetical posed

24

to the vocational expert did not include the condition that plaintiff miss 10 to 14 days of work per year for medical treatment; and (3) the ALJ accepted the opinion of Dr. Bentlif but did not accept his "opinion" regarding plaintiff's absences from work due to medical appointments and did not explain why the "full opinion" of Dr. Bentlif was not given controlling weight.

The relevant testimony by the medical expert appears below:

Q.      . . . Is it your position that this claimant is capable of working a 10 hour day?

A.      She should be able to work an eight hour day. . . .

Q.      Okay. Incidentally in your review of the record in -- with regard to the medical records that deal with your areas of expertise, has the claimant received unnecessary medical treatment?

A.      No.

Q.      And would it be fair to say that based either on the claimant's impairments or treatments for those impairments that Ms. Mullin to this point has missed at least two weeks or has been seen by a provider at least on days totaling at least 14 days or 10 days in a year on average, just in the areas of your expertise?

A.      That would appear to be a correct statement. . . .

(Tr. at 89-90).

Dr. Bentlif is board certified in internal medicine and gastroenterology (Tr. at 84). He testified that plaintiff's impairments include asthma and COPD associated with heavy smoking, oxygen denaturation at night which is now being treated with a CPAP, peripheral vascular disease resulting in placement of a stent, a bulging disc with

minimal stenosis, and peripheral neuropathy related to excessive nicotine consumption (Tr. at 85-86).

Contrary to plaintiff's argument, Dr. Bentlif never provided an opinion that plaintiff would need to miss 10 to 14 days of work per year. He specifically stated that in his opinion, plaintiff could work an 8-hour day but would be restricted to sedentary activities with the ability to lift 15 pounds occasionally and 10 pounds frequently; she could sit for six hours per day and walk or stand for four hours per day; she should not climb ropes, ladders or scaffolding; she could climb one ramp or one flight of stairs; she can occasionally stoop, kneel, crouch, or crawl; she has no restrictions with her upper extremities; she has no hearing, seeing, or communicating restrictions; she should not be exposed to excessive heat, excessive cold, or even minimal amounts of fumes, dust and irritants. He provided no opinion about the number of days of work plaintiff would likely miss each month due to treatment or her impairments. Rather, he simply agreed with plaintiff's attorney that plaintiff had not received any unnecessary treatment and that she had seen a doctor probably 10 to 14 times per year on average.

In addition to having no medical opinion from a treating or consulting doctor about plaintiff's need to miss work, there is no evidence that plaintiff's doctor appointments each required a full day off work. In Fieleke v. Colvin, 2015 WL 540303, *10 (N. D. Ind., February 9, 2015), the claimant presented the same argument:

> [T]he records that were considered by the ALJ constituted evidence regarding the frequency of Plaintiff's medical care during the relevant period. And, Plaintiff's argument is unavailing. She has not identified any evidence in the medical record that attendance at her appointments would, in fact, require her to miss an entire day of work. Many of the appointments she cited were physical

26

therapy appointments, which lasted less than an hour. It is also possible that these and other medical appointments could have been and would be able to be scheduled around a work schedule, such as on the weekends, during the lunch hour, or before or after work.

In Kittelson v. Colvin, 2013 WL 2444030, *11 (N. D. Iowa, June 5, 2013), the

court likewise rejected this argument:

> Here, the record demonstrates that Kittelson attended numerous doctor's appointments after being diagnosed with breast cancer in December 2008. When her radiation treatments concluded in June 2009, her doctor's appointments decreased. For example, in addition to some appointments for neck and arm pain, Kittelson primarily had monthly appointments lasting one hour or less to treat her difficulties with depression. The Court is unconvinced that such appointments lead to the conclusion that Kittelson was incapable of full-time employment. Moreover, the record lacks any opinion evidence from a treating doctor stating that Kittelson was unable to work due to absenteeism for attending doctor's appointments. Additionally, while Kittelson claims that she is unable to work due to needing to "take many days off for all of my medical/doctor appointments," the Court concluded in section V.B.1 of this decision that the ALJ properly discounted Kittelson's subjective allegations of disability.

In Peters v. Commissioner of Social Security, 2010 WL 1369245, *9 (N.D.

W.Va., March 31, 2010), the court declined to find the claimant disabled based on the

number of days of work missed due to doctor appointments:

> Peters argues that absenteeism due to frequent medical appointments would prevent her from working full-time, and relies on her history of numerous medical appointments to prove that she would be unable to meet the requirements of a full-time position. The Commissioner's response to this argument is that Peters is not entitled to disability unless her inability to work is based on a medically determinable physical or mental impairment that is expected to result in death or last for a continuous period of at least 12 months.

> The ALJ noted that the record does not contain any doctor report indicating inability to work because of numerous doctor appointments. He further noted that several of Peters' health problems appear to be improving, as a result of which the need for medical appointments may diminish, and that, in any event, any necessary appointments could be scheduled during her free time or at a time that would not require her to miss a full day of work.

In this case, there is no evidence that plaintiff would be unable to schedule multiple medical appointments on the same day[6] or schedule appointments before or after her normal work hours. There is no evidence that plaintiff's impairments or treatment will likely require her to miss 10 to 14 full days of work per year as plaintiff suggests in her brief. As a result, plaintiff's arguments on this basis are without merit.

## VII. FACTUALLY DEFICIENT OPINION

Plaintiff argues that the ALJ's opinion is factually deficient because it does not address the fact that a nurse prescribed a walker, the ALJ stated that plaintiff had not tried to quit smoking when the record reflects that she tried Chantix and nicotine patches without success, the ALJ inaccurately stated that plaintiff had not complained of significant leg symptoms between January 2008 and October 2010, and the ALJ noted that plaintiff had not followed up with a nephrologist when the record shows that she did.

## A. WALKER

Plaintiff argues that the ALJ's opinion is deficient because it does not address the fact that a nurse prescribed a walker. The record cited by plaintiff is dated January 5, 2011 (Tr. at 976). The exam of plaintiff's musculoskeletal system resulted in a finding of "weakness." Nurse Natwick assessed chronic pain, peripheral artery disease, chronic obstructive pulmonary disease, and multiple falls. There is a box on the form which, according to plaintiff's brief, reflects that the nurse prescribed a walker:

---

[6]Many of plaintiff's medical records reflect that her doctor or counseling appointments lasted from 15 to 30 minutes each, or they occurred during the evening hours.

(Tr. at 976).

There is no explanation beyond what appears above. The form also states that plaintiff's "reg meds" were refilled on 12/3 and her Tramadol was refilled on 12/21. Therefore, it appears that no medication refills were provided on this date, despite plaintiff's statement in her brief that Nurse Natwick "refilled Plaintiff's medications including Tramadol" (see plaintiff's brief at page 21).

First, it is not clear at all that this notation on this record means that the nurse prescribed a walker. However, even if one were to assume that this word on this form means that the nurse prescribed a walker, the nurse's opinion that a walker is necessary is not credible. This same nurse saw plaintiff on December 21, 2010 -- 16 days before the "walker" visit -- and during this visit she noted that there was no evidence of pain when plaintiff walked:



(Tr. at 978).

In addition, any prescription by a nurse for a walker is inconsistent with the medical evidence reflecting recommendations by plaintiff's treating doctors that she

29

exercise.  On November 29, 2010, Jhasi Vasireddy, M.D., told plaintiff to exercise (Tr. at 958).  On April 2, 2012 -- more than a year after the nurse allegedly prescribed a walker -- Diane Cornelison, D.O., at the Branson Neurology and Pain Center, encouraged plaintiff to exercise:  "She is counseled in depth about deconditioning and pain.  She is to get up and start walking and exercising. . . .  She is given back exercise sheet for strengthening. . . .  Encouraged to walk, on flat ground, starting at 5 minutes per day and gradually increasing 5 min/day/week until at 45 minutes 4-5 days per week. She is encouraged to do at home PT [physical therapy].  Exercise sheet given to her." (Tr. at 1234-1235).  She was assessed with Myalgia "due to deconditioning resulting from lack of movement." (Tr. at 1235).

On May 21, 2012, plaintiff told Dr. Cornelison that she was "going to have a family member get Social Security to pay for her to be a caregiver for her.  She is counseled that this is not necessary.  She states that she can get up and go to the bathroom on her own and she can cook for herself.  She is also able to dress herself and bathe herself." (Tr. at 1245).  Dr. Cornelison wrote, "She is strongly encouraged to walk.  She is to do her own daily activities.  She does not need a home health aid as she is perfectly capable of doing her own ADLs.  She is to do pool therapy when she puts her pool in next month." (Tr. at 1249).  Plaintiff had told Dr. Cornelison that she was going to have a pool put in and that her husband -- who is disabled due to a back impairment (Tr. at 1223) -- was going to build a deck around the pool for her.  Dr. Cornelison told plaintiff to attend one session of physical therapy to learn how to do

exercises at home. She again told plaintiff to start walking daily, working up to 45 minutes per day four to five days per week (Tr. at 1249).

Finally, the records by this nurse are internally inconsistent as well as inconsistent with the other evidence in the record. For example, on November 19, 2010, she observed that plaintiff's lungs were "normal" yet assessed bronchitis and chronic obstructive pulmonary disease (Tr. at 979). She noted that plaintiff's psychological assessment was normal (including no anxiety or depression), observing only that she had a flat affect; yet she assessed severe depression and anxiety. On April 28, 2011, Nurse Natwick told plaintiff to "start walking" (Tr. at 971) which is clearly inconsistent with the need for a walker. On May 12, 2011, plaintiff's musculoskeletal system was noted to be normal (Tr. at 970).

Even if the record by Nurse Natwick reflects a prescription for a walker, such a prescription would be entitled to no weight. Therefore, the ALJ did not err in failing to address the fact that a nurse prescribed a walker.

**B.    PLAINTIFF'S SMOKING**

Plaintiff argues that the ALJ's opinion is deficient because it states that plaintiff had not tried to quit smoking when the record reflects that she tried Chantix and nicotine patches without success. The ALJ had this to say about plaintiff's smoking:

> Importantly, the impartial medical expert testified that most of the claimant's health problems are attributable to her heavy smoking. It is generally reasonable to infer that if an individual is as limited as alleged by the claimant that they would seek to change behaviors that have a detrimental effect on their health and level of functioning. Thus, the claimant's inability to stop smoking strongly suggests that her respiratory and vascular disease symptoms are not as limiting as she alleges, otherwise the evidence would show more of an effort at smoking

31

cessation.  The claimant reported smoking 1-2 packs of cigarettes daily, and that she began smoking at age 8.  Going back to the time of her alleged onset date and earlier, she was counseled that she needed to stop smoking, and even agreed to stop smoking.  Since that time, her doctors have told her repeatedly that she needed to stop smoking.  However, the evidence shows that she did not attempt to stop smoking until 2012 when she tried Chantix, but reported she stopped this due to nightmares.  The undersigned notes that Chantix is not the only way to stop smoking, and the evidence does not show that the claimant [made] any effort other than attempting Chantix several years after her alleged onset date.

(Tr. at 18).

Plaintiff testified at the administrative hearing that she used to smoke a pack and a half of cigarettes a day (i.e., 30 cigarettes per day), but that she was able to cut down to 10 to 15 cigarettes a day when she and her husband decided to start going outside to smoke (Tr. at 107-108)  Clearly plaintiff is able to quit smoking if she was able to cut her cigarette consumption to 1/3 the number she previously smoked just by walking outside of her home to smoke.  In addition, the fact that plaintiff has the willpower to decide not to smoke in her house and stick with that goal, cutting her smoking by 50 to 67% of her previous habit just by making that one change, suggests that her smoking habit is not unconquerable.[7]

---

[7]The record contains numerous references to plaintiff's desire to continue smoking, rather than her inability to stop, as well as her half-hearted efforts to stop smoking.  On April 10, 2007, she was prescribed Chantix (Tr. at 488) but by May 14, 2007, she was no longer taking that medication, there was no indication of why she stopped taking it, and her smoking remained at 1 1/2 packs per day which was the same amount she was smoking when Chantix was prescribed (Tr. at 489).  By August 15, 2007, plaintiff was smoking 2 packs per day (Tr. at 509).  Geeta Khare, M.D., wrote, "My impression is that this patient has mild persistent asthma with underlying allergic rhinitis [hay fever].  Also confounding the issue is the patient's current tobacco use. . . .  I had a detailed conversation with the patient about smoking cessation. She is at this time not willing to consider stopping smoking." (Tr. at 520).  Plaintiff saw Janiece Bridges, M.D., and stated that "due to her mental health problems" she would have a difficult time stopping

32

In any event, the ALJ found that the alleged severity of plaintiff's shortness of

breath was not credible:

> The medical evidence of the claimant's respiratory disorders is also inconsistent with the frequency and intensity of the claimant's alleged shortness of breath. Pulmonary function tests in July 2010 and January 2012 showed a moderate airway obstruction. The fact that the test results did not change significantly is inconsistent with an alleged worsening in her respiratory disorder. Additionally, a June 2010 chest x-ray showed no acute pulmonary changes in comparison to an earlier study. The evidence shows that the claimant has received appropriate medical treatment for her asthma and COPD, and rarely, if ever, complained that her inhalers were not sufficient at relieving her respiratory symptoms. This evidence, along with the lack of significant changes [in] pulmonary function tests and x-rays, strongly suggests that the claimant's shortness of breath is not as frequent or as intense as she alleged.

(Tr. at 18).

This finding is supported by the substantial evidence in the record as a whole.

On July 27, 2006, plaintiff was smoking 1 1/2 packs of cigarettes per day, but she had

no shortness of breath (Tr. at 467). On August 28, 2007, plaintiff reported difficulty

breathing when she was outside in the heat but "when she stays in the house her

---

smoking (this is not a finding by a doctor, this is listed in the "subjective" section of the medical form) (Tr. at 1291). On April 2, 2012 -- after more than 5 years of being told by one doctor after another that she needed to stop smoking -- plaintiff told Dr. Bridges that because she was diagnosed with Buerger's disease of the kidneys (caused by smoking) and peripheral vascular disease, "she understands that it is imperative that she quit smoking" and plaintiff asked for a prescription for Chantix (Tr. at 1285). Just 22 days later, plaintiff saw Chris Weber, M.D., and had already given up on Chantix and smoking cessation: "Continues to smoke and declines to indicate how many packs a day she smokes. She notes trying Chantix as has her spouse. She can't tolerate it, and seems to think that it is otherwise hopeless trying to quit if Chantix does not work." (Tr. at 1222). In addition, the record includes numerous notations of plaintiff's continued spending what funds she has on cigarettes while at the same time claiming to be unable to afford her recommended medical treatment (for example, Tr. at 1172, 1287).

breathing is a lot better."[8] (Tr. at 504, 532). On July 7, 2008, plaintiff's respiratory exam in the emergency room was normal (Tr. at 679, 681). On November 27, 2008, plaintiff's respiratory exam in the emergency room was normal (Tr. at 674). On September 16, 2009, plaintiff went to the emergency room worried that she had pneumonia (Tr. at 1075). "[I]s on several asthma medications but she has been out of all of them (except albuterol MDI) since April or May. She is having trouble getting into a doctor because she does not have insurance." Plaintiff did not appear to be short of breath. X-rays showed no active cardiopulmonary disease (Tr. at 1077). She was assessed with bronchitis and prescribed an antibiotic and Prednisone. On November 18, 2009, plaintiff went to the emergency room complaining of cough and shortness of breath (Tr. at 1084). Chest x-rays were normal (Tr. at 1084). She was assessed with a muscle strain and referred to her primary care physician (Tr. at 1085).

On June 21, 2010, plaintiff had x-rays of her chest, and it was noted that there was no change since her last examination on November 18, 2009 (Tr. at 775). She had "mild reduced lung volumes in the lung bases as before." On July 7, 2010, plaintiff's lungs were noted to be normal (Tr. at 805). On August 3, 2010, her lungs were normal (Tr. at 807). On September 9, 2010, her lungs were normal (Tr. at 985). On September 16, 2010, her lungs were normal (Tr. at 984). On November 19, 2010, her lungs were normal on exam, status post bronchitis (Tr. at 979). On December 21, 2010, her lungs were normal (Tr. at 978). On January 5, 2011, her lungs were normal

---

[8]The ALJ's residual functional capacity assessment includes the requirement that plaintiff avoid exposure to temperature extremes.

(Tr. at 976). On March 3, 2011, plaintiff's lungs were normal (Tr. at 974). On March 31, 2011, plaintiff's lungs were clear with normal breath sounds (Tr. at 1088). On May 12, 2011, her lungs were normal (Tr. at 970). On May 26, 2011, her lungs were clear (Tr. at 1071). On September 6, 2011, plaintiff's lungs were clear, strong, and with equal breath sounds bilaterally (Tr. at 1018). On September 21, 2011, plaintiff's lungs were "clear, strong, and equal breath sounds noted bilaterally" (Tr. at 1014). On October 11, 2011, plaintiff's lungs were clear with no rales, no rhonchi, no wheezes[9] (Tr. at 1012). On November 10, 2011, plaintiff's lungs were clear with no rales, no rhonchi, no wheezes (Tr. at 1011). On December 9, 2011, plaintiff's lungs were clear with no rales, no rhonchi and no wheezes (Tr. at 1008). On December 14, 2011, plaintiff's lung sounds were clear and equal bilaterally (Tr. at 1007). On January 2, 2012, plaintiff had no shortness of breath and no wheezing (Tr. at 1002). Her lungs were "clear with no rales, no rhonchi and no wheezes." On January 5, 2012, chest x-rays showed no acute cardiopulmonary disease (Tr. at 1025, 1051). On February 9, 2012, plaintiff saw cardiologist Prasert Vijitbenjaronk, M.D., complaining of shortness of breath (Tr. at 1191). She continued to smoke 2 packs of cigarettes per day and was doing no exercise (Tr. at 1191, 1194). Her lungs were clear to auscultation bilaterally (Tr. at 1194). On March 5, 2012, plaintiff saw Dr. Vijitbenjaronk complaining of shortness of breath (Tr. at 1181). On exam her lungs were clear to auscultation bilaterally (Tr. at 1183). On March 9, 2012, Dr. Bridges observed that plaintiff's lungs were clear with no

---

[9]Rales are clicking, rattling or bubbling sounds. Rhonchi are snoring sounds. Wheezes are high-pitched whistling sounds caused by obstruction of the bronchial tubes.

rales, no rhonchi, no wheezes (Tr. at 1287).  On May 17, 2012, chest x-rays showed no

acute cardiopulmonary disease (Tr. at 1310).  Plaintiff's lungs were clear and normally

inflated.

Because the ALJ's finding with respect to the severity of plaintiff's shortness of

breath is supported by substantial evidence, the comments about the extent of plaintiff's

attempts to stop smoking are immaterial.

### C.  COMPLAINTS OF LEG SYMPTOMS

Plaintiff argues that the ALJ inaccurately stated that plaintiff had not complained

of significant leg symptoms between January 2008 and October 2010.  The ALJ's

comments about plaintiff's leg complaints follows:

> The claimant did not complain of significant lower extremity symptoms again until October 2010, when she reported claudication in her lower extremities with normal activity.  A month later she underwent a heart catheterization and angiography procedure that revealed severe right renal artery stenosis, moderate bilateral PVD [peripheral vascular disease] below her knees, and mild-moderate CAD [coronary artery disease].  It was recommended that she continue treatment for PVD and CAD, and consult with a nephrologist regarding her renal artery narrowing.  Her PVD did not require surgical intervention until March 2012, when she had a stent procedure to improve blood flow to her lower extremities. Even at this time, her arterial obstruction was assessed at moderate, which is inconsistent with the extent of the claimant's alleged functional limitations.

(Tr. at 17).

The ALJ's comments with regard to plaintiff's lack of complaints of significant leg

symptoms between January 2008 and October 2010 were in the context of analyzing

her credibility.  Although plaintiff's brief purports to cite instances when plaintiff

complained of significant leg symptoms between January 2008 and October 2010,[10] a review of the medical records establishes that the ALJ correctly noted plaintiff's lack of complaints.

The record reflects the following with respect to plaintiff's leg symptoms:

Gait was normal on August 10, 2006 (Tr. at 468).  Gait was normal on August 21, 2006 (Tr. at 469).  Gait was normal on January 16, 2007 (Tr. at 483).  Gait was normal on August 6, 2007 (Tr. at 498).  Gait was normal on October 8, 2007 (Tr. at 539).  Posture and gait were normal on October 23, 2007 (Tr. at 544).  Gait was normal on January 28, 2008 (Tr. at 596).

During the time period mentioned by the ALJ, the following occurred:

While in the hospital on January 15, 2009, plaintiff's physical examination was "unremarkable" (Tr. at 687).  There are no references in the medical records to complaints of leg pain until August 17, 2010, when plaintiff complained of pain in both legs and feet (Tr. at 806).  There was no exam performed of her extremities and no

_____

[10]Plaintiff states that on May 6, 2008, she saw a counselor and reported that she was unable to walk due to a lack of oxygen in her legs.  Plaintiff was not making a complaint about leg symptoms -- she reported this during a gathering of biological data for her counseling records (Tr. at 633).  Plaintiff states that on June 17, 2010, she told a nurse that she "only gets %40 [sic] O2 to limbs."  Again, this was not a complaint of significant leg symptoms, it was a collection of medical history during an initial encounter with a new treatment provider:  "Subjective:  Patient has history of bipolar, schizophrenia, COPD, asthma, DDD [degenerative disc disease] - low back, says she only gets 40% O2 to limbs.  Pt was supposed to have sleep study due to sleep apnea." (Tr. at 785).  Plaintiff points out that during a hospital stay for suicidal thoughts, she reported continued pain in her leg, and this occurred on August 23, 2010.  Even if this were considered to be a report of "significant leg symptoms," the fact that it occurred only a month before the ALJ found that plaintiff reported leg symptoms is hardly problematic.

37

further mention was made about this leg and foot pain by the treatment provider. On August 20, 2010, while being evaluated for a mental condition, plaintiff reported having pain in her legs (Tr. at 831). Two days later, while plaintiff was still hospitalized for suicidal thoughts, the record states, "pt has been feeling better, her leg is hurting, had test done, waiting for result." (Tr. at 838). The following day, James Junker, M.D., prepared a report of bilateral lower extremity color flow Doppler arterial examination, finding that plaintiff had evidence of "mild small vessel disease. . .; however, I do not see evidence of a critical stenotic lesion in this patient." (Tr. at 839). Plaintiff also had a Doppler venous ultrasound to evaluate for blood clots in her legs; this exam was normal (Tr. at 840). Ultram (narcotic-like pain reliever) was provided for complaints of bilateral leg pain and plaintiff reported that it was effective (Tr. at 853). Her gait was observed to be steady and well balanced (Tr. at 853).

Although plaintiff had tests on her legs while she was in the hospital, she had not sought treatment for leg pain; rather, she mentioned it when she was asked about any pain or other symptoms while being treated for suicidal thoughts.

The remainder of the record on plaintiff's complaints of leg pain consists of the following: On October 8, 2010, about a month after being released from the hospital, plaintiff saw Rami Akel, M.D., at Metro Heart Group complaining of bilateral lower extremity claudication (pain caused by too little blood flow) worsening over the past three years, and occasional episodes of chest pain (Tr. at 885-886). Dr. Akel noted that plaintiff's ABI (see footnote 5 on page 20) was moderately abnormal in both legs and assessed peripheral vascular disease (Tr. at 886). "I spent a long time with the patient

discussing smoking cessation and the importance of that and she is understanding. She is going to try to quit smoking." (Tr. at 886). On November 3, 2010, Dr. Akel performed an angiography and recommended medical therapy for coronary artery disease and peripheral vascular disease, as well as a nephrology consultation for renal artery stenosis (narrowing) (Tr. at 900). On November 29, 2010, plaintiff told Jhansi Vasireddy, M.D., a psychiatrist, that she had chronic pain and was told that she has poor circulation in her legs; but Dr. Vasireddy noted that "[t]he records from JMH indicate her Doppler studies in both her legs are normal." (Tr. at 955).

On September 21, 2011, plaintiff saw Brandon Forester, a nurse practitioner, for exacerbation of leg pain due to circulation problems (Tr. at 1013-1015). "States is out of her Tramadol." Her Tramadol (also called Ultram) was refilled and she was referred to Pain Management. On January 2, 2012, Janiece Bridges, M.D., noted that plaintiff was having "excellent pain relief" in her lower back and legs with her medication (Tr. at 1002). On January 26, 2012, plaintiff had x-rays of her lower back and an ultrasound of her lower extremities due to complaints of back and leg pain (Tr. at 1152). No obvious stenosis was seen in the ultrasound (Tr. at 1153, 1289). The lumbar spine x-rays were normal (Tr. at 1154, 1290).

On February 9, 2012, Dr. Vijitbenjaronk observed that plaintiff's gait was normal (Tr. at 1194). On March 5, 2012, plaintiff saw a cardiologist and reported pain in her legs when she walks less than a half a block; she denied resting leg pain (Tr. at 1183, 1206). She continued to smoke. Dr. Vijitbenjaronk observed that plaintiff had a normal gait. On April 2, 2012, plaintiff saw Jamie Flanagan, a nurse practitioner in the Branson

Neurology and Pain Center, complaining of low back pain radiating down her legs (Tr. at 1229). She reported that sitting was an alleviating factor (Tr. at 1229). Although plaintiff described her current pain as a 9/10 in intensity, Nurse Flanagan observed that plaintiff appeared only "moderately uncomfortable" (Tr. at 1232). Plaintiff was "counseled in depth about deconditioning and pain. She is to get up and start walking and exercising."

Because the ALJ's observation that plaintiff did not complain of significant leg symptoms for a 16-month period after her alleged onset date, and the medical records substantiate that plaintiff did not complain of significant leg symptoms for approximately 14 to 15 months after her alleged onset date, plaintiff's argument on this basis is without merit.

**D.    NEPHROLOGIST**

Plaintiff argues that the ALJ's opinion was factually inaccurate because he noted that plaintiff had not followed up with a nephrologist when the record shows that she did. In support of that argument, plaintiff cites the November 29, 2010, record reflecting a renal sonogram ordered by Rouba Ghoussoub, M.D., a nephrologist.

Again, a review of the medical records shows that the ALJ's statement regarding plaintiff's follow up with a nephrologist is accurate. A nephrologist is a kidney specialist.

Plaintiff mentioned urinary frequency only once, on August 15, 2007, while at an Asthma and Allergy Clinic (Tr. at 515). More than three years later, on September 16, 2010, plaintiff saw a nurse practitioner to go over test results and she reported back pain and difficulty urinating (Tr. at 984). She was assessed with dysuria (painful or

difficult urination); however, no tests were done. On November 3, 2010, Dr. Akel performed an angiography and recommended a nephrology consultation for renal artery stenosis (Tr. at 900). On November 29, 2010, plaintiff had a renal sonogram, and Alfred Shaplin, M.D., (a radiologist) indicated the findings were compatible with stenotic change (Tr. at 942). Plaintiff did not follow up with a nephrologist -- although Dr. Ghoussaub's name appeared as the ordering physician on the renal sonogram, there is no evidence that plaintiff had ever seen her. There is no evidence of treatment for kidney issues over the four months following that renal ultrasound. On March 31, 2011, plaintiff was in the emergency room for suicidal thoughts and reported that she had a history of renal artery stenosis and was "followed by nephrology," (identified as Dr. Ghoussaub) but had not had a renal artery stent placed (Tr. at 1087, 1090). On April 4, 2011, while in the hospital for suicidal thoughts, plaintiff saw Inderjit Singh, M.D., a nephrologist (Tr. at 1099-1100). "States that she has some difficulty with initiating her stream of urine. Denies frequency, urgency or dysuria [pain or difficulty urinating]. Denies hematuria [blood in the urine] or any other specific urinary complaints." Dr. Singh assessed acute kidney injury of unclear etiology. He discontinued her Toradol (non-steroidal anti-inflammatory) and diuretics and ordered further tests. No complaints or treatment for kidney issues occurred over the next six months.

On October 11, 2011, plaintiff was referred to nephrology due to elevated creatinine[11] (Tr. at 1012). On November 10, 2011, plaintiff saw Bryan Logan, a nurse

_____

[11]Creatinine is a chemical waste molecule that is generated from muscle metabolism. Creatinine is produced from creatine, a molecule of major importance for energy production in muscles. Approximately 2% of the body's creatine is converted to

practitioner in the Bridges Medical office (Tr. at 1011). "She continues to complain of pain in her calves but is not able to take the Tramadol due to elevated kidney function, referral to nephrology pending." On December 20, 2011, plaintiff told Janiece Bridges, M.D., that she was having a hard time passing urine; "she does have a full bladder at times and feels she needs to go but can't." (Tr. at 1006). Plaintiff was unable to provide a urine sample. She was told to bring one from home. "If she has an infection we will treat that, if not, we will make a referral to Urology." No complaints or treatment for kidney issues occurred over the next five months.

On May 17, 2012, plaintiff went to the emergency room where her husband reported that two days earlier she had vomited in her sleep and he was concerned that she would aspirate in her sleep (Tr. at 1299). Plaintiff reported difficulty with urination. She denied headache, dizziness, cough, chest pain, or difficulty sleeping. She did report sleeping all the time, including while sitting on the toilet. On exam plaintiff was observed to be alert and in no acute distress, she was in no respiratory distress and had normal breath sounds, her heart was normal, pulses were normal, she had normal range of motion in her extremities, and she was fully oriented. Chest x-rays were normal. She was assessed with a probable urinary tract infection (Tr. at 1296-1300).

_____

creatinine every day. Creatinine is transported through the bloodstream to the kidneys. The kidneys filter out most of the creatinine and dispose of it in the urine. Because the muscle mass in the body is relatively constant from day to day, the creatinine production normally remains essentially unchanged on a daily basis. The kidneys maintain the blood creatinine in a normal range. Creatinine has been found to be a fairly reliable indicator of kidney function. Elevated creatinine level signifies impaired kidney function or kidney disease.

She was told to avoid alcohol and non-steroidal anti-inflammatories and was given anti-nausea medication and an antibiotic.

There is no other evidence of kidney issues in the record, which establishes that plaintiff's contacts with nephrologists occurred when she was in the hospital or seeing a doctor for some other issue and was provided further testing; not because plaintiff sought out a nephrologist on her own as had been recommended.

Plaintiff testified that her kidney blockage causes her to need to use the bathroom frequently. However, all of the medical records dealing with plaintiff's ability to urinate indicate that she was having trouble urinating (to the extent that she was unable to provide a urine sample on two occasions), not that she needed to urinate frequently.

Based on the above, I find that the ALJ's notation in his opinion that plaintiff did not follow up with a nephrologist as recommended is supported by the medical records, and that the medical records contradict plaintiff's hearing testimony regarding her urinary symptoms.

## VIII.   CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible because he failed to consider the side effects of plaintiff's medications and he failed to consider plaintiff's explanations for lack of treatment and her efforts to obtain pain relief.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir.

1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are
inconsistencies in the record as a whole, the ALJ may discount subjective complaints.
Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303
(8th Cir. 1993). The ALJ, however, must make express credibility determinations and
set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d
220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an
ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the
court will defer to the ALJ's judgment unless it is not supported by substantial evidence
on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

 In this case, I find that the ALJ's decision to discredit plaintiff's subjective
complaints is supported by substantial evidence. Subjective complaints may not be
evaluated solely on the basis of objective medical evidence or personal observations by
the ALJ. In determining credibility, consideration must be given to all relevant factors,
including plaintiff's prior work record and observations by third parties and treating and
examining physicians relating to such matters as plaintiff's daily activities; the duration,
frequency, and intensity of the symptoms; precipitating and aggravating factors;
dosage, effectiveness, and side effects of medication; and functional restrictions.
Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p
encompasses the same factors as those enumerated in the Polaski opinion, and
additionally states that the following factors should be considered: Treatment, other
than medication, the individual receives or has received for relief of pain or other
symptoms; and any measures other than treatment the individual uses or has used to

relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

Plaintiff argues that Lortab (narcotic) made her sleepy and that her other medications also made her sleepy.  She testified that after she moved to Missouri, she did not receive much treatment in 2009 because she had to "fight" for her Medicaid and then had to wait 90 days to get in to see someone.

With respect to plaintiff's use of Lortab, the record reflects the following:  On June 12, 2008, while plaintiff was still living in Florida, K. J. Chason, D.O., who provided an initial psychiatric evaluation, wrote, "**I have told her that she cannot take Lortab and Xanax together due to risk of death.**  I have asked her to pick what she would prefer.  I have also asked her not to take Flexeril because she is already on Xanax which is currently working as a muscle relaxer for her."[12] (Tr. at 631, 728).  Dr. Chason noted that plaintiff was currently a "benzodiazepine dependent" (Tr. at 630, 728). Plaintiff did not choose to stop taking Lortab because it made her sleepy -- she stopped taking Lortab because her doctor would not prescribe both Lortab and Xanax and plaintiff indicated multiple times throughout the record that she could not function without Xanax and in fact took more of it than was prescribed.  Additionally, the record reflects that on September 27, 2008, plaintiff was taking Lortab and not Xanax, and she requested an increase in the dosage of Lortab but was denied (Tr. at 652).  Plaintiff's

---

[12]Lortab is a narcotic pain reliever; Xanax is an anti-anxiety medication. Both are controlled substances and both had been prescribed regularly to plaintiff for some time.

testimony that she stopped taking Lortab because it made her drowsy is contradicted by her request for a larger dose of Lortab.

The ALJ's finding that plaintiff did not complain of medication side effects is supported by the medical records. In fact, plaintiff specifically denied any side effects from Tramadol on December 9, 2011, and said that it was providing adequate pain relief (Tr. at 1008) and she denied any side effects from Xanax on March 2, 2012 (Tr. at 1288). The only evidence plaintiff points to in support of her argument that she made persistent efforts to obtain pain relief but could not take certain medication due to side effects is her own testimony. There are no medical records to support that testimony.

The substantial evidence in the record supports the ALJ's credibility determination. The records reflect that plaintiff told Chris Weber, M.D., that she does not drive because her hands jerk and twitch, "although none is noted during the course of her examination." (Tr. at 1223). Plaintiff told Robert Forsyth, Ph.D., that she does not drive due to her legs (Tr. at 993). She testified at the hearing that she stopped driving because her medication made her drowsy (Tr. at 109). And she reported in a Missouri Supplemental Questionnaire that she does not drive because she has "bad road rage." (Tr. at 408-410).

Plaintiff told Dr. Forsyth that she was fired from her last job for "standing up for another employee because she was being sexually harassed." (Tr. at 994). Yet she testified at her hearing that she lost her job because she had to take too many sick days.

46

Plaintiff told Lauren Roesch, M.S., at Community Treatment, Inc., in February 2011 that she was "basing her need for SSI solely on her mental health diagnosis." (Tr. at 1138). Plaintiff told Burrell Behavioral Health in December 2011 that she could not work due to the pain in her legs and COPD (Tr. at 1161).

On December 21, 2011, plaintiff told her counselor at Burrell Behavioral Health that she experiences spontaneous dizzy spells (Tr. at 1173); however, about a month and a half later, on February 9, 2012, when she saw a cardiologist, Prasert Vijitbenjaronk, M.D., she denied dizziness (Tr. at 1191), and when she saw Dr. Vijitbenjaronk again on March 5, 2012, she again denied dizziness (Tr. at 1181).

Plaintiff sought medical treatment for problems sleeping, yet she continued to consume very large quantities of caffeinated beverages against medical advice.

On October 9, 2011, plaintiff requested a refill of anxiety medication; during triage she denied having ever tried to hurt herself, even though she had been hospitalized for suicidal ideation (locking herself in a bathroom with two butcher knives and threatening to cut herself) (Tr. at 1065).

The ALJ observed that no treating doctor ever imposed any restrictions on plaintiff, and instead her doctors recommended that she increase her physical activity, that she walk and exercise.

In addition to failing to follow up with a nephrologist as recommended and failing to quit smoking as recommended, plaintiff also failed to heed her doctor's advice to significantly cut down on her caffeine consumption. On April 30, 2012, plaintiff reported to Dr. Cornelison that she drinks "lots and lots!!" of caffeine (Tr. at 1229). Dr.

Cornelison noted that plaintiff drinks excessive caffeine and counseled her to consume "less than 2 servings per day." (Tr. at 1235). However, on May 21, 2012 -- three weeks later -- her caffeine use was reported to be "5+ drinks per day," indicating that plaintiff continued to disregard her doctor's advice (Tr. at 1246). Her caffeine consumption continued to be rated the highest possible number on every medical chart whenever that question was asked of her.

Finally, I note, as did the ALJ, that plaintiff was often inconsistent at best and dishonest at worst when attempting to get particular prescriptions from various treatment providers. On October 23, 2007, plaintiff denied any history of substance abuse in connection with her disability claim (Tr. at 543). On June 21, 2008, plaintiff reported having used marijuana three times a day from age 13 through age 21; she was assessed with alcohol dependence and marijuana dependence in remission (Tr. at 628, 630, 727-728). On June 11, 2008, plaintiff went to the emergency room complaining of a headache and stated that she had a prescription for Xanax to be filled the next day and she was out of Lortab (narcotic) (Tr. at 683). She said that Medicaid had assigned her a doctor, but that doctor indicated he was not taking new patients (this emergency room was in Florida). She was given a prescription for 10 Lortab tablets (Tr. at 684). The following day, K. J. Chason, D.O., wrote, "**I have told her that she cannot take Lortab and Xanax together due to risk of death.** I have asked her to pick what she would prefer. I have also asked her not to take Flexeril because she is already on Xanax which is currently working as a muscle relaxer for her." (Tr. at 631, 728). Dr.

Chason noted that plaintiff was currently a "benzodiazepine dependent" (Tr. at 630, 728).

On September 27, 2008, it was noted that "Dr. Chason refused to continue with medications due to Casandra testing positive for several unauthorized substances. Casandra was told to refrain from Xanax use and self reports such abstinence. Casandra's medical doctor currently prescribes Zoloft, Seroquel and Lortabs [narcotic] which she recently asked for an increase on but was not granted." (Tr. at 652). On November 3, 2008, plaintiff was diagnosed with alcohol dependence in remission, marijuana dependence in remission, and benzodiazepine dependence, active (Tr. at 651). On February 11, 2009, plaintiff was discharged early from a mental health program "due to suspected prescription misuse" (Tr. at 655). On September 1, 2010, plaintiff attended counseling and was educated on the negative effects of caffeine on her symptoms and on her medication (Tr. at 812). Her response was, "I almost fell asleep in the waiting room, I'm so tired." She told her counselor that she had been taking 4 to 6 Tylenol PM on some nights (a normal dose is 2).

On August 20, 2010, while being evaluated for alleged suicidal thoughts, plaintiff denied any history of drug abuse (Tr. at 832). On November 12, 2010, plaintiff told Gautam Rohatgi, D.O., that she takes 8 Tylenol PM at night (Tr. at 959). On November 29, 2010, plaintiff told her psychiatrist that she used marijuana every day from age 11 to 21, and that she drinks just a couple times a year but when she drinks she gets drunk (Tr. at 956). On November 29, 2011, plaintiff told Robert Forsyth, Ph.D. (in connection with her disability application) that she had no history of illegal drug use (Tr. at 994).

49

On October 11, 2011, plaintiff reported taking Tramadol more often than it was prescribed and it was not controlling her leg pain; she requested a refill, but that request was denied due to elevated creatinine (see footnote 11 on page 41) (Tr. at 1012). "Advised the pt to take Tylenol for pain control.  Pt has been referred to pain management and nephrology."  On December 27, 2011, plaintiff saw Janiece Bridges, M.D., for severe pain (Tr. at 1003).  "She is out of Tramadol. She has been taking it at a faster rate than what has been prescribed."  Dr. Bridges prescribed Percocet, a narcotic (Tr. at 1004).  On April 2, 2012, plaintiff was told to take her narcotic pain medication as directed -- it was noted that she had been taking three per day instead of two per day as prescribed (Tr. at 1234).

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not credible.

## IX.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 27, 2015

Case 6:14-cv-03217-REL   Document 17   Filed 08/27/15   Page 50 of 50